We'll hear argument first this morning in Cases 10-238, Arizona Free Enterprise Club Freedom Club Pac v. Bennett and the consolidated case. Mr. Moore. Mr. Chief Justice, and may it please the Court, this case is about whether the government may insert itself into elections and manipulate campaign spending to favor its preferred candidates. Arizona does this in a manner that is even more burdensome to free speech than the law at issue in Davis v. FEC. Arizona burdens the law of three groups that pose no threat of corruption under this Court's precedence, independent expenditure groups, self-financed candidates, and candidates who raise private funds under one of the lowest contribution limits in the nation. Under Davis v. FEC and this Court's well-established precedence, the matching funds provision is unconstitutional and should be struck down. Mr. Moore, you don't have any objection, you wouldn't have any objection, if Arizona trebled the amount at the outset. In other words, there was a maximum amount, the so-called matching funds. If it were given all in one lump and the publicly funded candidate was told, give it back if you don't use it, that would be okay? That would be constitutional under Davis, Your Honor. This case is not about whether the State of Arizona may provide campaign financing using public funds, nor is it about whether the ability of Arizona to ensure that those who receive the public funds can run effective campaigns. What this case is about is whether the government can turn my act of speaking into the vehicle by which my political opponents benefit with direct government subsidies. Kagan Could I try to understand that argument a little bit better, Mr. Moore? Suppose, and I know that you think that this is not the case, but just bear with the hypothetical. Suppose that there were, in fact, no deterrent effect on your speech or on the speech of any candidate. In other words, that people thought, well, you know, I'd rather be have me be the only person who talks, but I'd rather talk than be silent, even if it means my opponent can talk, too. So that there is no deterrent effect from this law whatsoever. Would there still be a constitutional objection? Your Honor, in Davis, this Court recognized that a trigger like this, a law that turns the choice of my choice to speak effectively into fundraising advantages for my opponents constitutes a substantial burden. So even if candidates continue to speak, the law constitutes a substantial burden on their speech. Kagan Well, it constitutes a substantial burden. So even if every single person makes a choice, yes, I want to continue to speak, it does not chill any speech. I suppose I'm not sure what it means to constitute a substantial burden if, in fact, the law does not chill speech. Well, Your Honor, this Court in Davis recognized that when the government reaches into a campaign and attempts to manipulate campaign financing in order to — in order to basically effectuate the outcome, that constitutes a — an illegitimate governmental purpose. Scalia Mr. Moorer, suppose — suppose the government imposes a fine of $500 for all candidates to continue to engage in political speech and pay the $500. Would that make the $500 penalty for political speech constitutional? Moorer No, it would not, Your Honor. Kagan But in fact, there's no such restriction here, is there, Mr. Moorer? There's no restriction at all here. It's more speech all the way around. Moorer I would disagree with that respectfully, Your Honor. There is a restriction here. Every time an independent expenditure group or a privately financed candidate speaks above a certain amount, the government creates real penalties for them to have engaged in unfettered political expression. Kagan Well, doesn't the government actually just give a selective subsidy? It's not a penalty. It's just saying, in order to — to run an effective public financing system, when you speak, we're going to give a subsidy over a certain amount. So the trigger does not trigger a penalty, it triggers a subsidy. Moorer Your Honor, in Davis, this Court recognized that in the context of competitive elections, which are a zero-sum game, what benefits one candidate will burden necessarily or harm the other candidate. Scalia Didn't they call it a subsidy in Davis? If I recall the argument, I think that's what it was characterized as there, too. Did they characterize it as a penalty? I doubt it. Moorer In fact, it was not a subsidy in Davis, Your Honor. The effect of this law is considerably harsher than the law at issue in Davis. In Davis, the non-millionaire's candidate still had to go out and actually raise the funds that the Millionaire's Amendment permitted him to raise. In this case, the law provides direct government subsidies based on my act of speaking to my political opponents. Kagan There is, though, a significant difference between Davis and this case. What the expenditure triggered in Davis was a discriminatory restriction that would never be allowed in and of itself. What the law triggers here is something that, as Justice Ginsburg said, the government could do from the get-go, which is subsidize the speech of a candidate who decides to participate in a public financing system. Moorer Well, Your Honor, the — I would point out that independent expenditure groups do not have that choice of participating in the subsidy or not. So to the extent that Davis relied on the fact that there was a discriminatory treatment of speakers in the same race, this case, this law replicates and actually exacerbates the harm that was at issue in Davis. Kagan But there's no particular as-applied challenge from independent speakers in this lawsuit, is there? Moorer Yes, there is, Your Honor. I represent two independent expenditure groups. Kagan My understanding was that the suit was brought as a facial challenge to the entire law. Moorer This is a facial and as-applied challenge, Your Honor. Kennedy In this case, do you think the law is content-neutral within its own universe? It applies just to political speech, so it's not content-neutral in that sense. But within the scheme that it sets up, is it content-neutral? Moorer Absolutely not, Your Honor. Kennedy Why? Moorer Because the content of the message that will trigger matching funds, particularly for independent expenditure groups, is the content of the message. If an independent expenditure group speaks in favor of a privately financed candidate, they will not trigger matching funds. If they speak against a publicly financed candidate, they will trigger matching funds. That is not only content-based, it is also a rejection of the standard this Court has enunciated in Citizens United that the government cannot make distinguishing burdens on the basis of an identity of a speaker. Kennedy In Justice Ginsburg's hypothetical, I'm still trying to think about it. Suppose there is one candidate for the pink party and then three candidates for the lump sum Justice Ginsburg was talking about, but there is only one candidate on the other side and he has to face, or she has to face, three funded people. Is that constitutional? Moorer It would not be — I'm sorry. It would be constitutional under Davis. And I think that the point, Your Honor, is respectfully— Scalia I didn't understand the hypothetical, Your Honor. I really didn't. Moorer One person is on one side, three people are on the other side. And under the Arizona law, if the three people on the other side are all participating candidates, each of them gets a bonus if there is only one person speaking on behalf of the nonparticipating candidate, right? Kennedy Yes, that's absolutely true. Moorer All right. So $10,000 by the nonparticipating candidate triggers off $30,000 against him. Kennedy That's exactly right. Moorer All right. In the Justice Ginsburg hypothetical, wouldn't you have the same problem? In different terms, in that one candidate faces three people, all of whom are funded by the government. Moorer Well, this case is not challenging a public financing system. And the— Kennedy I'm just asking, as a theoretical matter, whether there would be a constitutional problem in the case that I put under Justice Ginsburg's hypothetical. Moorer Not under Davis, Your Honor. Ginsburg How about not under Buckley? Kennedy Not under the First Amendment. There may be instances where a public financing law is so lopsided that it creates a coercive effect, and Buckley was quite clear that one of the things that was acceptable about the public financing system at issue in that case was that it was voluntary. But in this case, we're dealing with a very different type of First Amendment harm. The trigger matters, Your Honors. It is, in fact, determinative. It is exactly the same kind of trigger. Ginsburg I thought that the point of Buckley was that the public funding, which you could accept or reject, that the justification for it was that it increased rather than decreased speech. And the — I think you're quite right in recognizing that matching funds, this Court has said, do not conflict with the First Amendment. Kennedy Your Honor, if I had said that, I was mistaken. Ginsburg I'm not matching funds. Public funding. Kennedy Oh, okay. Ginsburg Public funding. And so if it turns out that the State's public funding isn't being used because the limits are low, and yet the State wants to conserve the public fisc. So instead of just increasing the amount at the outset, it says the object is the same, but we're economizing by not giving it out in one lump sum. We're giving it out in installments. Roberts Your Honor, in Riley v. National Federation of the Blind, this Court recognized that the government cannot sacrifice speech for efficiency. And if we accept the holding of Davis v. FEC and accept that that is still a holding that is viable under the First Amendment, then what the position of the Respondents is, is that they, in fact, can sacrifice free speech in order to be more efficient. But Breyer Can you tell me on that, because I take it you agree with Justice Ginsburg about Buckley. In Buckley, the Court says, ''Public financing as a means of eliminating the improper influence of large private corporations furthers a significant government interest.'' We both agree that's what it says. I take it that's what it means. Now, your objection is how much do they pay? Do they have a trigger? Not quantitatively, but here they say it's okay to finance a public candidate publicly, okay to do that. Now, what we're going to do is give them $1 million to start with, up to $3 million to spend, depending on how much their opponents spend. Now, you think that's unconstitutional. My question to you is, what would be a constitutional system, in your opinion? That would be helpful. Your Honor, in Buckley, this Court recognized a constitutional system. Breyer I'm not interested in Buckley. I'm interested in your opinion. You object to the amount being paid in installments. What, in your opinion, would be a constitutional system? I don't need to repeat my question, which I just did, but I want your answer to that. Scalia I assume your opinion can be based upon Buckley, however. Yes, the presidential financing system is constitutional, Your Honor, and I would also respectfully disagree with your characterization that the nature of our objection has to do with the fact that our opponents are receiving money. The problem here is not that the opponents of my clients are receiving money. It's what triggers that, and what triggers that is my exercise of my free speech rights. Alito Would there be anything unconstitutional about a system that worked roughly like this, that the beginning, at some point prior to each election cycle, the commission that supervises this law would make a calculation about how much money would be needed for a candidate in a gubernatorial race or a State Senate race or an assembly race, if that's what it's called in Arizona, to get that candidate's message out to the electorate, and that would be the amount of the public funding, period. That would be a constitutional system, Your Honor. There is no constitutional objection, or at least we're not raising any constitutional objection to the idea that there is a — that public financing means that people can't run effective races. You can have a public financing system with sufficient funds to run an effective race, but what you cannot do is exactly what Arizona has done, which is turn my act of speaking into the vehicle by which my political opponents benefit. Kagan But that's interesting, Mr. Moorer, because I don't see all that much of a difference between Justice Alito's hypothetical and the facts here. In other words, you said that Justice Alito's hypothetical would be constitutional, even though under Justice Alito's hypothetical, the State is trying to figure out how much money it takes to run a competitive race, and giving people who enter the public financing system that amount of money. That's exactly what the State is doing here, but it's doing it in actually a more accurate way. So if Justice Alito's hypothetical is constitutional, why isn't this? They're both trying to do the same thing, which is to put sufficient money in the hands of people who enter the public financing system in order to run a competitive race. Your Honor, one of the things that would distinguish that is that it — Justice Alito's hypothetical completely divorces the amount of the grant from my political activity or the political activity of people who don't want to or cannot take public funds in Arizona. Well, I think to the contrary, Justice Alito's hypothetical, just the State is estimating how much a person will spend. Here, the State is measuring how much a person will spend. The only difference is that one is more accurate than the other. Your Honor, I believe the distinction would lie in the fact that the purpose of this law is not to provide necessarily the ability of candidates to run effective publicly financed campaigns. The purpose of this law is to limit spending in elections and to level the playing field. Justice Alito's hypothetical does not. I think the purpose of this law is to prevent corruption. That's what the purpose of all public financing systems are. Your Honor, I would respectfully disagree that the purpose of this law is to prevent corruption. And I would like to read from the executive director of the Clean Elections Commission, who said that it cannot be disputed that the purpose of the Clean Elections Act is to equalize the playing field and to give participating candidates equal opportunity to get their message out, which is at Joint Appendix 236. Well, Mr. Moore, some people may use certain buzzwords and other people don't use those public financing systems have been based upon is the idea that when there is a lot of private money floating around the political system, that candidates and then public officeholders get beholden to various people who are giving that money and make actions based on how much they receive from those people. And that's the idea of a public financing system, is to try to prevent that. Well, that is the basis of public financing systems in general, but this system does not actually address that, because this Court has said that there is a lot of private money floating around the political system. Scalia, I'm sure that in some of the public financing cases that we've heard argued, it was asserted that the purpose was to level the playing field and that that was an entirely valid purpose. I'm unaware that all public financing laws have had as their purpose simply to avoid corruption. Your Honor, when this law was promoted, when it was drafted, when it was propagated and campaigned about to the people of the State of Arizona, it was presented as doing two things, leveling the playing field and limiting spending in campaigns. It wasn't until this Court's decision in Davis that the State of Arizona suddenly discovered that the purpose of the law was actually to fight corruption, or the primary purpose was to actually fight corruption. But what about on the background of there had been a number of scandals in Arizona? There had been vote-buying. I thought that that was part of the origin of this law, that it was not, as you now say, had nothing to do with corruption. I thought it emerged out of that, those startling incidents of people actually selling their votes. Well, they were selling their votes for outright bribes, Your Honor. They weren't selling them for campaign contributions. And if this law was aimed at the single narrow exception that this Court recognized to the general principle that restrictions on political activity violate the First Amendment, then they would not have structured this law in the way that they did, which is to burden the speech of three political speakers that pose no threat of corruption under this Court's precedents. Sotomayor, I just want to understand exactly what you claim the burden is, because I thought that what the circuit and the courts below said was that there was no evidence that any candidate actually didn't speak or didn't fundraise because of this law. There are some claims to the contrary in your briefs before us, but I've looked for that below, and there doesn't appear to be any record of that. So I'm going to start from that assumption, that there was no evidence in the courts below that any candidate stopped speaking because of or stopped collecting money because of this. So exactly what is the burden otherwise? What are you claiming the burden is? The burden is that the government is choosing to give someone else money? No, Your Honor. First, I would respectfully disagree with the characterization of the Ninth Circuit of the evidence produced at the district court. There was considerable evidence of people not making expenditures, of slowing their fundraising, as one of my clients put it, to a crawl in order to avoid triggering matching funds. But even if that were relevant, the or even if that material did not exist, in Davis this Court recognized that the inherent structure of the act constitutes a substantial burden on speech because it presents the choice of having to either engage in a I want to go, not rely on Davis, but just articulate for me, assuming my hypothetical, the burden is that you have to delay fundraising or delay expenditures because you're choosing to do so. We are not choosing to do so. We are being coerced into doing so by the government. No, if you spend it, if you spend it at the time you want or you collect it at the time you want, no one's the law is not telling you not to do it. You find it an advantage not to do it, correct? No. Because your opponent won't speak as loud and won't respond, correct? I would respectfully disagree, Your Honor. What the harm in delaying your speech is, is that in order to minimize the triggering of substantial, and I would also add unfair benefits to a publicly financed candidate based on one's act of unfettered political expression, candidates and independent expenditure groups all testified, all the Petitioners testified, that they delayed speaking in order to minimize the effect of matching funds. And the other thing is that the law is not telling you not to do it. Suppose the Court, after this argument, sent you a letter saying, if you would like to file an additional brief, you have the opportunity to do so, and we're not going to allow your opponent to file a brief. Would you take advantage of that opportunity? All else things being equal, yes, Your Honor. Now, if we said you can file an extra brief, but if you do that, your opponent will also be able to file an extra brief, would that figure in your thinking? It certainly would, Your Honor. And under Arizona's system, if you applied Arizona's system to this hypothetical, not only would Mr. Phillips be able to file an additional brief, but the State of Arizona would be able to file an additional brief, and the Solicitor General's office would be able to file an additional brief, and anybody who weighed in on the other side would be able to file an additional brief. That's the very nature of this law in that it creates — it is entirely structured to create disincentives, as the proponents of this Act were quite clear it was, to create disincentives on people speaking for engaging in political activity more than the government preferred. Kennedy. Do you think it would be a fair characterization of this law to say that its purpose and its effect are to produce less speech in political campaigns? I believe that that is a goal, and I believe that's the effect. The entire — the entire motivation of this law was to limit the — limit spending and leveling the playing field. Limiting spending indicates that they wanted less political speech in the State of Arizona, and that's what they've got. Do you think that if Joe Smith doesn't have much money, takes public finance at all, that that could discourage some other people, Brown and Johnson, from running? No, I don't believe so. No? There's not — it's not going to be a situation where government paying a million dollars to Smith to help him in the campaign would discourage some other person from running?  It's not a — If we say you can file a brief, and if you do, other people can file, is that my — forget the briefs, it's too far-fetched. All right. Very clear, however. I did think you'd give the other answer, to tell you the truth, because I just don't see why giving somebody a million dollars might not discourage a poorer candidate from running. Well, Your Honor, the courts that have looked at public financing systems, including the Buckley Court, notice — or were made clear that one of the things that constitutes a constitutional public financing system is its voluntariness. At certain markets — I know Joe, the guy who wants it, it's voluntary for him. But his opponents can't do anything about that. I'm just saying Joe takes the money. So Brown and Smith say, oh, my God, he has a million dollars, forget it, I'll stay at home, I won't run. And you say that just doesn't happen. Never happened. Okay. And I gather that people who have looked into the Arizona scheme also say what you think will happen never happens either. Your Honor, it's not the question of people being dissuaded from running because their opponent may be able to mount an effective campaign. The issue is the government turning my speech into the vehicle by which my entire political message is undercut. And if there are no further questions, I'd like to reserve the remainder of my time. Thank you, counsel. Mr. Phillips. Mr. Chief Justice, and may it please the Court, public funding of elections results in more speech and more electoral competition and directly furthers the government's compelling interest in combating real and apparent corruption in politics. There was a suggestion in response, I believe, to Justice Kagan's question that this law was not intended to combat corruption. But I would say that this law is not intended to combat corruption in politics. Roberts, the supposition that it results in more speech, let's take the independent expenditure example. You have one candidate running against three others. There is an independent expenditure on behalf of the one candidate. That means, say, $10,000. That means each of the other three get $10,000 of their own. Now, that might promote more speech, but the effect may well be for the independent expenditure to say, I'm not going to spend the money, and so the other candidates don't get the money, and you have less speech. Well, Your Honor, what I submit is it would result in more speech, certainly, if all of the candidates got the $10,000. There is no evidence in the record that if anyone actually not spent, any independent group not spending money either in that circumstance or any other circumstance would lose it. What would that evidence look like? The evidence would simply look, plausibly, even just someone saying that they didn't spend money because of that, although that would be not very hard evidence. But there isn't even that sort of evidence with respect to independent groups here, Your Honor, and it makes sense. Well, other than somebody saying it, I'm just curious what the evidence would look like. You're proving a negative. You're saying, well, this person didn't do something because of this, and that's pretty hard to do. That's possibly true, Your Honor. The statistical data, however, here indicates that independent expenditures have, in fact, gone up since the implementation of matching funds in Arizona. That obviously doesn't directly address the three-candidate situation. I acknowledge that. But there's no evidence that independent expenditures have been suppressed at all, Your Honor. And I would think the question here, Your Honor, is. Scalia, may I ask how it combats corruption, unless it suppresses large contributions by certain entities? I mean, I can understand you say, well, it will stop big donors from giving $10 million to somebody's campaign and having that person in his pocket. But that donor is still going to have that senator or whoever it is just as much indebted to him if he gives $10 million, regardless of whether everybody else gets $10 million as well. How does it combat corruption unless, unless the other side is correct that its whole purpose is to suppress the contribution of $10 million, to make it unworthwhile for anybody to give $10 million? Your Honor, Arizona's triggered matching funds provision combats corruption in the same manner that public funding combats corruption, because that the law is designed to encourage candidates to accept public funding because it offers a viable public funding option to them while conserving the State's resources. And public funding serves the anti-corruption rationale in two fundamental ways. First, it frees the candidates who accept public funding from the need to accept potentially corrupting by the country. Alito, well, there are States that have public funding without having a matching fund provision. I would appreciate it if you would compare these two regimes. The first is exactly what Arizona has now. The second is exactly what Arizona has now, minus the matching fund provision. So under the second one, you have very strict contribution limits and you have reporting of all contributions. Now, why does the addition of the matching fund provision serve an anti-corruption interest? We are, I think, for the same reasons, I believe, that are implicit in the Buckley Court's upholding of public funding at the same time that the Court upheld contribution limits and disclosure requirements, I think implicitly, therefore, holding that the three could go together serving the anti-corruption interest. And I think it does that, first, by freeing, as I said, freeing the publicly funded candidates from the need even to take the limited private contributions that would be allowed under the law, in which this Court has never held there is a minimum at which that no longer conceivably becomes corrupting, but secondly, it combats corruption by providing for more candidates running, more political speech, and more electoral competition, all of which have happened in Arizona. And where you have more candidates and more electoral competition, you have less you are going to have less corruption. The record. Roberts. So the idea is this is a way of encouraging candidates to take the public financing, right? Yes. Well, would it encourage more candidates to do that if you doubled the amount that was available for every additional amount that the privately financed candidate spends? He spends $1,000 over the amount and the publicly financed candidate gets $2,000. A lot more people are going to do the publicly financing route. If that were the case. It would encourage them more, Your Honor. It's not our contention that anything that a State or Congress did to encourage public funding would necessarily be constitutional. I think the question would be different if it were a 2-to-1 or, to make a more stark contrast, a 10-to-1 match. I think that would raise multiple questions. One question would be, looking at the statute in its entirety, has the public funding scheme become coercive rather than voluntary? It would raise the question whether the purpose of the law were really to simply provide viable funding to candidates, but instead. But that's kind of an odd line to find in the First Amendment, isn't it, that you get 100 percent matching as opposed to, say, 110 percent or 150 percent? Somewhere in the First Amendment the line is drawn on the amount. I think somewhere in the First Amendment there is a line, Your Honor, implicit in Buckley, where a public funding law provides such substantial benefits without sufficient countervailing burdens to publicly funded candidates that it becomes coercive rather than voluntary, and therefore you have coerced someone into accepting a spending limit, which I believe would be, certainly subject to strict scrutiny and almost certainly unconstitutional. And I think that is, the Court would need to assess that in each instance, and I think it could be done. I certainly don't think that here you have a coercive system. A third of the candidates don't accept public funding, and most of those who don't and accept and face publicly funded candidates actually win. So it doesn't work? Well, certainly it doesn't work in the sense, Your Honor, if the goal were for everyone to accept public funding, it doesn't work in that sense. But it certainly works in the sense that two-thirds of the candidates do, and it works in the sense that there hasn't been a repeat of the public corruption scandals in Arizona since the law was passed. Kennedy, you think that one reason for people to decline participation in the program is because they do not want to deter independent expenditures? And let me talk about independent expenditures for just a few minutes, if you don't mind. You indicated independent expenditure has gone up. I thought there was some data in the record to show that population has gone up, and so there's an argument about that. But just as a common sense matter, if I'm someone with the capacity and the will to make an independent expenditure, why don't I think twice if this is going to generate an equal amount on the other side, which might be better spent? Sometimes an independent expenditure is not really that effective. It's in a bad market. It's a bad message. But this results in cash to the participating candidate who then can use it in the most effective way. Your Honor, independent groups Kennedy, all of which is designed to probe this idea that this somehow does not deter independent expenditures. I, frankly, am tentatively of the opposite view, so you can tell me about that. Your Honor, independent expenditure groups, there's no evidence, in fact, that it really has been deterred. Your Honor, independent expenditure groups essentially have to take their candidates as they find them, if you will. There's no discrimination among someone who is speaking in favor of a privately financed candidate and one who is speaking in favor of a participating candidate. The different treatment is the different treatment of the candidates. Someone who speaks against a privately financed candidate runs the risk that that person is going to use the ad against them to do all of the things that the public finance candidate may not do. He can raise private contributions, he can take money from his political party, he can spend his own money, and he can spend unlimited amounts of money. Scalia. I don't know how you can say that there's no evidence that it's been deterred. Is something true just because you say it? There are in the briefs statistical evidence of how much the population of Arizona has increased and how much less since the enactment of this law the total expenditures have been increased. There was testimony in the district court from individuals who said that they withheld their contributions because of this. It's obvious statistically also that many of the expenditures were made late in the game, where perhaps they were not as effective, in order to be unable to trigger the matching funds in time for the opposing candidate to do anything about it. I do not understand how you can say that there is no evidence. I mean, maybe you might say I do not find the evidence persuasive, but don't tell me there's no evidence. Maybe I should say there's no significant evidence, Your Honor. But with respect to each of the items that you mentioned, with respect to the population point, Your Honor, there is no evidence in the record, and it does not make sense, that expenditures either by candidates or by independent groups would increase proportionally to the population of a State. Because most of the expenses of a campaign are fixed and not variable. Scalia O'Reilly has the same expenditures as New York State? No, no, no, Your Honor, of course not. Scalia You don't expect the two to have any relationship? Of course not, Your Honor. I don't suggest that there's no relationship between population and expenditures, but you wouldn't expect it to go up proportionally, which is what the argument that the Petitioners make is, that it didn't go up proportionally. And you wouldn't expect that, particularly given that you don't know what the demographics of the population increase have been in Arizona and elsewhere in the country. But with respect to the evidence of individuals, there are two Petitioner independent committees in this case, Your Honor, the Arizona Taxpayers Action Committee and the Arizona Free Enterprise Club. At Joint Appendix 584 is the testimony of the first, that they never withheld money from a race because of matching funds and can't recall any contributor to them doing so, and the Arizona Free Enterprise Club at Joint Appendix 666 and 670, the treasurer testified that matching funds never caused them not to make a contribution and that the PAC to which they contribute at JA 670 didn't recall making a decision not to spend money because of matching funds. With respect to that, there's a back and forth about the record and common sense. As a matter of common sense, I think this has already been asked, if you knew that a $10,000 expenditure that you would make that would support a candidate would result in $30,000, $40,000, $50,000, depending on how many opposition candidates there were, available for them, wouldn't you think twice about it? I might think twice about it, Your Honor, but first, I think thinking twice is not a severe burden. I think I might think twice in some circumstances if I knew that by spending a certain amount of money I had to disclose the fact that I was doing that and what my political views were and lose my anonymity, but thinking twice, this Court has held in that circumstance, doesn't create a severe burden, and we would submit that thinking twice here is not. Roberts Well, if you're thinking twice and one way you're thinking is not to do it, that sounds like a sufficient burden. Well, Your Honor, if it were a sufficient burden, it would presumably have been a sufficient burden with respect to disclosure, where this Court has recognized that some people may not spend or contribute because of the disclosure requirement. Well, our cases, as you know, have drawn a distinction between expression and disclosure. Yes, Your Honor, but the point I'm making is that the disclosure this Court has recognized potentially chills, deters the expression itself. Kennedy Are you saying that anything that has to be disclosed can also be prohibited? I mean, I just don't see the equivalence here. Roberts No, Your Honor, I'm not – I wasn't suggesting that, but I don't think so. Kennedy It seems to me that this law has a severe criticism level at it, severe legal invalidities alleged, quite without reference to disclosure. Roberts Well, Your Honor, I was making an analogy to disclosure in the sense of the think twice notion that Mr. Chief Justice raised. But I don't think this creates any more of a burden, and we would submit less of a burden than a disclosure requirement. You would expect someone who believes that their speech is more persuasive than the other participants in the race, whether they be an independent group or a candidate, to choose more speech, because they think that if I speak, even if the other people speak, my message is going to get out there and it's going to be preferable. There may be some few candidates, although there's not a record of that here, some few groups or candidates who would decide that they would prefer less speech. It's better for me if my opponent or the other candidate doesn't speak more because he's going to be more persuasive than I am. That is so better. Roberts Your Honor, I don't think that there is a particular view of the political process that may not be applicable in every case. Political scientists sometimes tell you that it's not persuasion, but simply playing to your base, getting them more actively involved. And so it's not a somewhat more academic view that people are going to sit down and just regard which one is persuasive. Is that a permissible objective for the State to pursue, to value a particular view of the electoral process over another? Your Honor, I don't think that the State is doing that. What I'm addressing is the effect of the law, and I think Your Honor makes a good point, which is that they assume, Petitioners assume that essentially this is a zero-sum game and that because if I spend $10,000, the other guy is going to get $10,000 to respond, that somehow that's a wash. Well, it's not a wash, first, because I think my speech is more persuasive, so I'm going to do it anyway because I'd rather get it out there. And secondly, because I may be spending my $10,000 on getting out my voters, and I need to do that regardless. And that's why you don't see in the statistics any evidence that this actually suppresses speech. And as I said, there may be some few candidates who would opt for less speech because it's strategically better for them. But we would submit that that's not the case. Alitoso, but even if it is the case that those candidates who choose not to participate are willing to spend additional money even though it triggers matching funds, I don't see what that proves. A candidate who is deciding whether to participate or not presumably makes a calculation at the beginning. Do I want to spend more than the matching fund amount, even though I know that if I do that, the other side will get additional money? Now, if they say no, I don't — I'm not going to do it under those circumstances, they'll take the public financing. And if they choose the private financing, it means they probably made a decision going in that they're going to be one of those who is willing to suffer the consequences of spending over the amount. So I don't see what this — I don't see what that proves. But, Your Honor, I think what it proves is that you — the key point in here is that initial choice that is voluntarily made by each of the candidates, whether the system of public financing under which you may receive matching funds is better for them or whether the system— Alitoso, could I ask a question that goes back to Justice Kennedy's question, which I don't think you fully had a chance to — or fully answered, and that has to do with the independent expenditures. Let's say there are two candidates running for governor, and one who is a participating candidate is taking a position on a very controversial Arizona issue with which I disagree. And the other is a nonparticipating candidate who is taking a position on that controversial issue, and I agree with that. Now, if I choose to run an ad, pay for an ad, supporting the nonparticipating candidate, I know that the candidate that I dislike on that issue is going to get an additional amount of funds. And — but if I choose to run an ad supporting the participating candidate, the opposite doesn't happen. Now, why isn't that a clear-cut discrimination based on the content of speech? Because, Your Honor, the discrimination, if you want to — if you call it discrimination or different treatment, is based on the initial choices of the candidates as to how they're going to finance their campaigns. It's not based on the content of the speech. There's — matching funds do not turn in any way on the ideas or the messages or the viewpoints or the subject matter of the candidate or the independent group's speech or on the identity of the speaker. It turns entirely on what choice the candidate made at the outset. And it is analogous, in a sense, Your Honor, to the situation that's faced by a contributor who is deciding whether to contribute, for example, to a 501c3 or a 501c4 organization. If they contribute to the organization that can lobby, they don't get a tax deduction. Alito, if I'm the independent — if I'm the independent expenditure maker, I haven't made a choice at the beginning. I haven't decided to participate or not participate. What I care about is the issue that's being debated between these two candidates. And, Your Honor, two points. You're free, of course, to run an ad that addresses the issue without expressly advocating for or against any candidate without triggering matching funds. And secondly, the candidates made a choice, and if you're the person who is — who supports the participating candidate, you can't make a contribution to that candidate while you could to the other candidate because of the choice that was made. And you can be responded to, if you run an ad criticizing the nonparticipating candidate, you can be responded to with unlimited amounts of money taken from a political party, the person's own money, whereas, too, if you attack a privately financed candidate, you would only be subject to being potentially responded to with limited matching funds, and it all flows from the voluntary choice that is made at the outset by the candidates about which system of financing is better for them. And this is a system. The matching funds system is a mechanism that the State uses in order to be able to offer viable public funding to candidates without wasting public resources, and both the logic and evidence demonstrates that it is, in fact, effective both at promoting speech by encouraging candidates to run and, indeed, particularly resulting in more competitive races for incumbents — against incumbents in Arizona, and promoting speech. And I'd just like briefly to address Justice Alito's question about the ex ante measurement of the funds. Now, of course, we would submit that it's not relevant because we're not in — should not be in strict scrutiny and, therefore, don't need to show this as a least restrictive means, Your Honor, but, Justice Alito, an ex ante system would run substantial risks of underfunding or overfunding races, and in particular — and, therefore, wouldn't serve the State's interest in saving money or in properly measuring — but in particular would run the risk of having an incumbent who might have been in office for several terms unopposed and not having spent any money in those races, and now you are measuring how much his possibly now viable challenger will get in public funding based upon some minuscule amount of money that the incumbent has needed to spend. So I think that that would not serve the State's interest in ensuring that candidates actually have viable public funding. And I see my time has expired. Thank you. Roberts. Thank you, Mr. Phillips. Mr. Jay. Mr. Chief Justice, and may it please the Court, I'd like to begin, if I may, with a couple of comments about whether the independent expenditure aspect of this statute is content-neutral. And I think that looking at this in the context of a multi-candidate race, which most races in Arizona are, is important to set the context, because most races in Arizona are not one candidate against another candidate. Every House district in Arizona has two — has two members, so every general election has at least four candidates. And it simply is not the case that running an ad in support of a publicly financed candidate does not trigger matching funds. It depends not on what the ad says, not even on who the candidate is being supported, but on whether another candidate in the race takes public financing. So money spent to support one publicly financed candidate may trigger matching funds to another. That's not a content discrimination. It's not a content discrimination. Scalia. Mr. Jay, do you agree with the assertion of Mr. Phillips that this does not favor incumbents? I would have thought that if I'm an incumbent with name recognition, I would love to be able to not raise any money and just take the public funding, knowing that if worse comes to worse and I have an opponent who does have a lot of independent expenditures for him, I'll be able to get that money free from the State. It seems to me it's very much pro-incumbent rather than anti-incumbent. Oh, Justice Scalia. Which one should expect campaign finance restrictions to be? Justice Scalia, I'm happy to endorse the sentiment, because I think that the Petitioner's evidence in this case, the Petitioners who were incumbent officeholders and say that they didn't spend money because they feared the response that would be paid for by matching funds, I think their own evidence, including the declaration they put in at Joint Appendix 364, says if I can keep the spending down, me as an incumbent I have a tremendous advantage. That's an Arizona legislator talking to one of the — talking to their — one of their experts. And that's because — and a race that features low dollar amounts on both sides often advantages an incumbent. And that is the purpose — that is the purpose of the matching funds provision, right, to allow — to allow challengers to be competitively funded. That's the purpose of the initial grant. The reason that it's— Scalia, it's not a matter of deterring people from making contributions, Justice Scalia. When there are competitive races, the matching funds provisions provides a formula for giving the publicly funded candidate as much money as the private — as the public    funded candidate that they're competing with. And in most cases, the incentives on both sides are for more speech, for both sides to get out their message, run their ads, and persuade the voters. In some cases, and we submit that the anecdotal evidence that Petitioner has submitted touches on these cases, the privately funded candidate may have an incentive to keep spending down, but we don't think that's true systemically under this system. We think that the public financing in general, and the matching funds provision in particular, facilitates speech, because the only consequence of running an independent expenditure, for example, at most, the consequence is that another party will get to run a responsive ad, and the sum of speech will be increased. Roberts, do you agree that under our precedents, leveling the playing field for candidates is not a legitimate State purpose? We do, Mr. Chief Justice, and that, of course, is not what's at work here. Roberts, well, I checked the Citizens Clean Elections Commission website this morning, and it says that this Act was passed to, quote, level the playing field when it comes to running for office. Why isn't that clear evidence that it's unconstitutional? Well, Mr. Chief Justice, whatever the Citizens Clean Election Commission says on its website I think isn't dispositive of what the voters of Arizona had in mind when they passed this initiative. The Court – this Court has recognized since Buckley that public financing serves a valid anti-corruption purpose, and it does so because it eliminates the influence of private contributions on the candidates who take public financing. And it eliminates the— But would you agree that the matching fund provision by itself does not serve an anti-corruption purpose? Well, Justice Alito, the matching fund provision, the State of Arizona has concluded, is an important way of ensuring that candidates will take public financing, because it is a formula of ensuring that candidates will have enough money to run competitive races without wasting the State's money by – by— Now, what about the – that's a general question, answer this if you wish, don't if you don't want to. And the same goes for your opponent. But as I hear this argument, what's going through my mind is we are deeply into the details of a very complex bill. The Caine-Feingold is hundreds of pages, and we cannot possibly test each provision which is related to the other on such a test of whether it equalizes or incentivizes or some other thing, because the answer is normally we don't know. And it is better to say it's all illegal than to subject these things to death by a thousand cuts, because we don't know what will happen when we start tinkering with one provision rather than another. That thought went through my mind as I've heard this discussion. Comment or not upon it as you wish. I will comment in this way, Justice Breyer. I think that it's remarkable – I appreciate the opportunity and I will take it. The parties in this case agree that public financing is itself not objectionable. The parties in this case agree that even a large government grant at the outset, which could be used to fund responsive ads to a privately financed candidate or to independent expenditures, that's not problematic. Scalia Anything that makes it more attractive to take the public financing is okay? And what if the State of Arizona says, we're not going to just give money to the other candidates, we're going to send out officers of Arizona to argue on behalf of these other candidates? Now, that would be clearly bad, right? And would you come in and say, well, it's perfectly okay because its purpose is to make public funding attractive to candidates. The mere fact that it makes it more attractive does not answer the question whether it's constitutional. It doesn't make it – it doesn't just make it more attractive, Justice Scalia. It allows publicly funded candidates to run on the same footing as privately funded candidates because they can spend comparable amounts. That is the point that we're making. Not that any incentive the State could dream up would be constitutional. But the mere fact that there are incentives and disincentives on both sides I think doesn't suffice to answer the question. The fact, as Mr. Phillips pointed out, there may be disincentives to engage in speech when a disclosure requirement takes effect. Anyone who wishes to run independent expenditure under the system upheld in Buckley, anyone who had spent over $100 had to disclose. And the Court recognized in Buckley that it was undeniably the case that public disclosure would deter some individuals. And the Court nonetheless didn't apply strict scrutiny because that is not the kind of severe burden that the First Amendment recognizes. The Court should just say that this law aims to allow publicly financed candidates to run on the same footing as privately financed candidates. Isn't that right? The same dollar amount footing, Justice Alito, but there's a far different mix of benefits and burdens. That's leveling the playing field, isn't it? It's not, Justice Alito, because there is a far different mix of benefits and burdens that a publicly financed candidate takes. And there is an absolute cap under this matching funds provision, there is an absolute cap above which a publicly financed candidate cannot spend, no matter what. Once a publicly financed candidate reaches that cap, which they've agreed to as a condition of taking public financing, independent groups and their opponents can raise more money, can run more ads against them, completely without limit. And you have to take that into consideration when you're considering what incentives and what deterrent effect the matching funds provision is having. Publicly funded candidates accept certain limits, and one of those limits is an absolute limit on spending. The matching funds provision simply adjusts that limit based on how much is being spent in that race and that. Roberts. Roberts. Why do you think the Elections Commission then tells us its purpose is to level the playing field? I don't speak for the Elections Commission, Mr. Chief Justice, but the State of Arizona has said in this case that the purpose of public financing, as indeed was the purpose of the presidential public financing system that this Court upheld in Buckley, is to combat corruption. And public financing is a recognized way of combating corruption, and giving out these matching funds is a way of encouraging candidates to participate. Well, in your hypothetical of the participating candidate who spends up to the limit, what happens if independent expenditures are then made on his behalf? Independent expenditures on his behalf don't – would trigger public matching funds to any other matching – to any other candidate in the race. No, no, there's two participants – there's two candidates, one who's a participant and one who's not. The participating candidate spends up to his limit. He can't get any more money. But then he gets a lot of additional support from independent groups, correct? In a two-person race, Justice Kennedy, that could happen. It could. And the privately financed candidate, unlike the publicly financed candidate, who's the target of independent expenditures, is free to raise more money and use that – use those additional funds to respond. But the point that you made, that the participating candidate is limited, leaves out the fact that there can be additional expenditures on his behalf by independent groups. There can be – may I finish the sentence? There can be, but a candidate deciding whether to participate by definition doesn't know in advance whether there will be independent expenditures on his behalf, and the matching funds provision allows that candidate to know when he elects public financing that he will have enough money to compete. Thank you. Thank you, Mr. Jay. Mr. Moore, you have 4 minutes remaining. Thank you, Mr. Chief Justice. With regard to the record evidence of an actual chill, I would note that the record – if this Court takes the opportunity, as it's obliged to do under the Bose Corp. decision to look at the entire record, the evidence is replete with examples of people not making expenditures, such as Tony Bui, who refrained from sending out mailers, making auto calls, or distributing information. John McComish also had a similar response. The Arizona Taxpayers Action Committee did not engage in a particular campaign because it would have triggered matching funds. But ultimately, when we get right down to it, though, the question is, does this create the same kind of burden as in Davis? And I could go through point by point Mr. Phillips and Mr. Jay's arguments, but they're all answered by Davis. Davis recognized that this type of interference with the voters' decision as to who to elect to office and the purpose of doing that in order to raise the voices of those the government thinks is speaking too little and muffle the voices of those the government thinks is speaking too much is completely illegitimate. This case is determined by Davis. For instance, the argument that Mr. Phillips made that speech has gone up in Arizona is undone by Davis, which recognizes that increases in the aggregate of speech cannot justify restrictions on individual First Amendment rights. Kagan. Mr. Morris, Davis starts off by saying that if what had been triggered was not an inequitable contribution limit raise, but instead both — a contribution raise for both candidates, that would have been perfectly appropriate, notwithstanding that that would have put many independent funders to a real choice. The independent funder says, well, I'm not taking any contributions, so that's only going to help my opponent. What's the difference in that case? I think what this Court was recognizing in Davis is that when the government relaxes restrictions on free speech, when there's more freedom, that doesn't constitute a violation of the First Amendment. That's not what the government is doing here. It's effectuating its goal of limiting spending and leveling the playing field by burdening and disincentivizing people to engage in their First Amendment rights. Kagan. Well, as I said, the Davis system that was — the system that was specifically approved in Davis would disincentivize many people, many independent funders, from speaking, would put that person to a choice of the kind that you say that your clients are being put to a choice, the exact same kind of choice. It would not have the unfair trigger that this system has. The entire argument here is not that our clients have a concern with too much speech. Our concern is that their speech is turning into the mechanism by which their political goals are undercut. So each time they speak, the more work that they do, the more their opponents benefit. That, on its face, creates a common-sense disincentive to engage in more and more political activity. If there are no further questions, Your Honor, I'll thank the Court for its time. Thank you, counsel. Counsel. The case is submitted.